STATE OF NORTH CAROLINA v. ERROL DUKE MOSES

No. 574A97

(Filed 20 August 1999)

### 1. Criminal Law— joinder—first-degree murders—transactional connection

The trial court did not abuse its discretion by allowing two first-degree murder charges against defendant to be joined for trial, although the murders occurred two months apart, where a transactional connection was established by the following substantial similarities between the two murders: both were murders of young men whom defendant knew and with whom he was associated in the drug trade; both murders occurred after the victims had paged defendant; both victims were shot in the head with the same gun at a range of approximately two feet or less; both murders occurred in Winston-Salem on the premises of the victims; and both murders occurred after defendant argued with the victims.

### 2. Jury— capital case—jury selection—death penalty views— excusal for cause

The trial court did not err in a capital case by allowing the State's challenge for cause of a prospective juror because of his

death penalty views where the juror responded affirmatively to the trial court's initial inquiry concerning his inability to impose the death penalty, and the juror repeatedly stated during examination by defense counsel that it would be hard for him to sentence defendant to death because of his death penalty views.

**3. Jury— capital case—jury selection—death penalty views— life qualifying standard—excusal for cause**

The trial court did not violate the "life qualifying" standard of *Morgan v. Illinois*, 504 U.S. 719 (1992), by denying defendant's challenge for cause of a prospective juror based upon her death penalty views where the juror admitted to defense counsel that she had a tendency to "lean more strongly towards the death penalty" for a premeditated murder, but the juror responded negatively when the trial court and the prosecutor asked her on numerous occasions whether she was predisposed to automatically apply the death penalty in all first-degree murder cases, she responded affirmatively when both the trial court and the prosecutor inquired whether she could put her personal views aside and follow the trial court's instructions and consider a sentence of life imprisonment rather than the death penalty, and she confirmed upon reexamination by defense counsel that she could follow the trial court's instructions with regard to the possible penalties for first-degree murder.

**4. Evidence— other crimes—similar modus operandi—admissibility to show identity**

Evidence of defendant's murder of Griffin was properly admitted under Rule 404(b) to show defendant's identity as the perpetrator of the Dunkley murder, and vice versa, where the modus operandi of the two murders was similar enough to make it likely that the same person committed the two murders in that the two victims were associates of defendant in the drug trade and were shot multiple times with the same gun; witnesses testified that the gun belonged to defendant; the victims were killed in the same manner and in the same city within a period of two months; both victims argued with and paged defendant prior to their deaths; Griffin was seen with defendant prior to his death and Dunkley was to meet with defendant when last seen alive; and both men were murdered on their premises. Furthermore, the trial court did not abuse its discretion in refusing to exclude this evidence under Rule 403 as being more prejudicial than probative. N.C.G.S. § 8C-1, Rules 403, 404(b).

STATE v. MOSES

[350 N.C. 741 (1999)]

**5. Evidence— prior misconduct with gun—identification of gun—credibility of witness**

In a prosecution for two first-degree murders in which a former drug associate of defendant testified he had seen defendant on several occasions in possession of a gun similar to the 9-mm Ruger which was used in both murders, testimony by the witness that after he told defendant he had been robbed of defendant's drugs and money, defendant pulled out his 9-mm Ruger, put it to the witness's head, and threatened him was relevant and probative of the witness's identification of the gun. The State was entitled to have the jury know the circumstances of the possession in order to allow the jury to judge the credibility of the witness. Furthermore, the trial court did not err by failing to exclude this evidence under Rule 403. N.C.G.S. § 8C-1, Rule 403.

**6. Evidence— ballistics expert—opinion testimony—same conclusion by any other expert—absence of prejudice**

Defendant was not prejudiced by the testimony of an SBI ballistics expert on cross-examination that any other competent expert would have reached the same conclusion that bullets and cartridge cases were fired by defendant's gun where this comment was a statement of the expert's confidence in his opinion in response to a challenge by defendant; during closing argument, defense counsel turned the statement to defendant's advantage and impeached the expert on the statement; another expert testified that he had reviewed the same evidence and had reached the same conclusion; and there was no reasonable possibility that the jury would have reached a different verdict if the testimony had been disallowed.

**7. Evidence— admission by defendant—not vague and uncertain—relevancy**

Testimony by a witness about defendant's admission to him that he killed a murder victim was not so vague and uncertain as to be inadmissible where the witness was certain defendant made a statement to him admitting the killing but was uncertain about the exact words defendant used and did not want to attribute anything to defendant that he did not say. Furthermore, this testimony was relevant to the issue of the identification of defendant as the perpetrator of the murder, and any uncertainty by the witness goes only to the weight and credibility of the testimony rather than to its admissibility. N.C.G.S. § 8C-1, Rule 401.

STATE v. MOSES

[350 N.C. 741 (1999)]

### 8. Sentencing— capital sentencing—aggravating circumstance—course of conduct—common modus operandi and motivation

The trial court did not err by submitting the (e)(11) course of conduct aggravating circumstance for each of two first-degree murders where a common modus operandi and similar motivation exists between the two murders. Further, the fact that the murders occurred two months apart goes to the weight rather than the admissibility of this evidence. N.C.G.S. § 15A-2000(e)(11).

### 9. Evidence— capital sentencing—expert witness—bias—fees in this and other cases

The prosecutor was properly permitted to cross-examine defendant's sentencing expert in this capital sentencing proceeding about his fee in the instant case and previous cases and the number of times he had testified for defendants in the last two years for the purpose of showing bias.

### 10. Evidence— capital sentencing—defendant's state of mind—entries in defendant's notebook—cross-examination of expert witness

The prosecutor was properly permitted to cross-examine defendant's mental health expert in this capital sentencing proceeding for two first-degree murders about entries in a notebook possessed by defendant near the time of the murders, including a handwritten list of serial killers, to determine to what extent, if any, these entries entered into the expert's opinion regarding defendant's state of mind at the time of the murders.

### 11. Sentencing— capital sentencing—death sentences not disproportionate

Sentences of death imposed upon defendant for two first-degree murders were not excessive or disproportionate where the conviction for one murder was based upon both premeditation and deliberation and the felony murder rule; the conviction for the second murder was based only upon the felony murder rule; the jury found the course of conduct aggravating circumstance for both murders and that one murder was committed while defendant was engaged in the commission of an armed robbery; a sentence of death has not been found to be disproportionate in a case in which the jury has found a defendant guilty of murdering more than one victim; and the course of conduct

aggravating circumstance has been held sufficient, standing alone, to support a sentence of death.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from two judgments imposing sentences of death entered by Eagles, J., on 18 November 1997 in Superior Court, Forsyth County, upon jury verdicts finding defendant guilty of first-degree murder. Heard in the Supreme Court 10 May 1999.

*Michael F. Easley, Attorney General, by Mary D. Winstead, Assistant Attorney General, for the State.*

*J. Clark Fischer for defendant-appellant.*

WAINWRIGHT, Justice.

Defendant Errol Duke Moses (a/k/a, Craig Briskin, Henry Perry, Michael Gordon, Ethan Chen, Tony Moses, Thomas Hilton, and Ian Jackman) was born 2 December 1971. Defendant was indicted on 7 October 1996 for the first-degree murders of Ricky Nelson Griffin and Jacinto E. Dunkley. The cases were consolidated for trial, and the following evidence was presented by the State.

## GRIFFIN MURDER

Between 10:00 p.m. and 11:00 p.m. on 24 November 1995, Ronald Webb, Anthony Sheppard, and Ricky Griffin (Griffin) were at Crockett's Barber Shop in Winston-Salem. As the three men were leaving the barber shop, defendant approached Griffin. They began arguing, and Griffin pulled a knife on defendant. After a brief skirmish, Griffin apologized, and they went their separate ways.

On 25 November 1995, around 2:30 a.m., Donald Brooks saw Griffin talking with defendant on a street corner near Griffin's house. Griffin was a drug dealer who also stole property and sold it to make money. Griffin frequently dealt with defendant. During this encounter, Brooks testified that Griffin was attempting to sell a telephone to defendant. According to Brooks, defendant told Griffin he did not want the telephone, but he did want marijuana. Griffin told defendant he would return to his house and page Larry Cason to get some marijuana. Brooks then asked defendant to take him home, and the two men left in defendant's Volkswagen automobile.

Soon thereafter, Griffin's brother, Randolph Griffin, saw Griffin in the kitchen of their residence in Winston-Salem. Griffin told his

brother he was trying to page defendant and Cason. Telephone records indicate that six calls were placed from the telephone at Griffin's residence during the early morning hours of 25 November 1995 between 2:47 a.m. and 2:55 a.m., including two calls to defendant's pager and four calls to Cason's pager. According to Randolph Griffin, when he left to go upstairs to his bedroom, his brother was still in the kitchen. Thereafter, he heard three gunshots outside his house. When he ran outside to see what had happened, he found his brother lying in a pool of blood in front of the house. Randolph Griffin called 911, and law enforcement and emergency rescue personnel arrived within a few minutes. Griffin was transported to the hospital and pronounced dead shortly thereafter.

At the crime scene, law enforcement officers found a 9-mm shell casing on the ground approximately fifteen feet from the victim's body. On 27 November 1995, Randolph Griffin was raking the front yard of his house when he found two additional 9-mm shell casings on the ground. He called law enforcement, who came and retrieved the shell casings.

According to Cason, on 25 November 1995, after receiving the second page from Griffin, he returned the call from a residence where he was playing cards. He told Griffin he did not have any marijuana to sell. Thereafter, Cason testified he left the card game and was driving home when he received the third page from Griffin. At that point, Cason pulled over and called Griffin from a pay telephone but received no answer. He then decided to go see what Griffin wanted. When he arrived at Griffin's house, he saw Randolph Griffin holding his brother in the front yard. Each of the telephone calls placed to and from the Griffin residence was confirmed by telephone records.

Dr. Patrick Lantz, a Forsyth County medical examiner, performed an autopsy on Griffin's body on 25 November 1995. Lantz determined Griffin died as a result of three gunshot wounds to the head: two wounds were about one inch apart in front of the victim's right ear, and one wound was to the left side of his head. The two wounds on the right side of the face were surrounded by stippling, which is caused when gunpowder comes out of the barrel of a gun, strikes the skin's surface, but does not completely burn. Because of the presence of stippling, Lantz determined these two shots were fired from a range of approximately two feet or less. The third wound, on the left side of the face, did not have stippling present. Therefore, Lantz could not determine the distance from which the shot was fired.

Further, projectiles recovered from Griffin's body were determined to be from a medium-caliber handgun, possibly a 9-mm handgun.

## DUNKLEY MURDER

Sabrina Mims met defendant in December 1995, and they began dating shortly thereafter. That same month, defendant introduced Mims to Jacinto Dunkley. Defendant informed Mims that Dunkley was the person for whom defendant sold drugs. During the time they dated, Mims observed both a .380-caliber pistol and a 9-mm Ruger handgun in defendant's possession. Sometime during the week prior to 27 January 1996, defendant attempted to get Mims' cousin, Shatina Givens (Givens), to set up Dunkley by meeting him and finding out where he kept money and drugs in his house. Defendant offered to pay Givens to carry out the plan, but Givens refused.

On 26 January 1996, Mandy Wood, Dunkley's girlfriend, was watching television at Dunkley's house when defendant called. Dunkley answered the telephone. He and defendant began arguing about how Dunkley had been trying to get in touch with defendant, but defendant had been avoiding him. At one point, Dunkley got upset and hung up the telephone. Defendant called back, and this time Wood answered the telephone. She handed the telephone to Dunkley, and he and defendant began arguing again. The two ended the conversation by agreeing to meet the next night, 27 January 1996, at 9:00 p.m.

On 27 January 1996, defendant and Casey McCree were at Mims' apartment in Winston-Salem, "drinking and partying" with a number of different people. According to McCree, it was an "all day event." Telephone records indicate that at approximately 9:09 p.m., defendant received a page from Dunkley. Thereafter, between 9:30 p.m. and 10:00 p.m., defendant asked McCree to ride with him to Dunkley's house. Defendant told McCree that Dunkley owed him money and that he was going to collect it. Defendant and McCree left the apartment in defendant's Volkswagen and proceeded to Dunkley's house. Defendant told McCree he was "going to go do something and if another person is there you're going to have to go ahead and do her, too."

On the way to Dunkley's house, defendant stopped at the Enterprise Car Rental. While there, defendant stole a Buick automobile. McCree then drove the Volkswagen and defendant drove the stolen Buick to an undisclosed area, where they left defendant's

Volkswagen. They proceeded to Dunkley's house, and when they arrived, defendant parked the stolen Buick just across and down the street from the house. Defendant and McCree approached the house, and McCree knocked on the door. Dunkley answered the door, and McCree shook his hand and walked in. Defendant pulled out his 9-mm Ruger and approached Dunkley, who backed into the kitchen. In a fierce tone, defendant began asking Dunkley where his money was located. When Dunkley asked what he was talking about, defendant shot him in the chest. Defendant asked again where his money was located, and then shot Dunkley in the head. While Dunkley lay dead on the kitchen floor, defendant asked McCree to help him ransack the house so it would look like a robbery. McCree saw defendant take a wad of money from a drawer in Dunkley's house and a gold-colored diamond ring from Dunkley's finger.

When defendant left Dunkley's house, he took the keys to Dunkley's Pontiac and asked McCree to drive it. McCree followed defendant, who was driving the stolen Buick, and they abandoned Dunkley's automobile. Defendant and McCree drove the stolen Buick back to Enterprise Car Rental and parked it in the same space it was parked earlier. From there, defendant and McCree stopped briefly at Robyn Gardner's apartment in Winston-Salem. Defendant lived in the apartment next door with his girlfriend Anesha. According to Gardner, she was not sure exactly what time it was when defendant and McCree arrived at her apartment, but it was dark outside. She testified that defendant asked her to hide a gun, later identified as the 9-mm Ruger used in both murders. Around 11:30 p.m., defendant and McCree returned to Mims' apartment.

Later, defendant, McCree, and Givens left the apartment and were involved in an automobile accident. When Winston-Salem Police Officer John Tesh arrived on the scene, he found defendant, who had been driving the automobile, lying about twenty feet from the wreckage. Defendant complained that his right arm was hurt, and he tried to stuff a wad of money into his pants pocket. Tesh also observed a pager, a gold-colored diamond ring, a black leather jacket, and a torn tee shirt lying on the ground three to five feet from defendant. Additionally, Tesh discovered McCree lying near the car and Grenecia Givens' body inside the car. Grenecia Givens was pronounced dead at the scene, and defendant and McCree were rushed to the hospital.

According to Wood, Dunkley's girlfriend, Dunkley drove her to work at 6:00 p.m. on 27 January 1996 and was supposed to pick her

up when she got off work at 2:00 a.m. the next morning. However, Dunkley never arrived, and she did not hear from him. On 30 January 1996, Wood went by Dunkley's house, but no one answered the door. On 31 January 1996, Winston-Salem police officers responded to a possible break-in call at Dunkley's house. When the police arrived, they discovered Dunkley's body in the kitchen. The house was in disarray. A 9-mm shell casing was seized from the scene.

On 1 February 1996, Lantz, the same medical examiner who examined Griffin's body, performed an autopsy of Dunkley's body. According to Lantz, Dunkley died as a result of two gunshot wounds: one wound to the left side of the head, above and behind the left ear, and the other to the abdomen and right arm. The head wound was surrounded by stippling, indicating a shot was fired from approximately two feet or less. The wound to the abdomen was caused by a bullet which entered below the rib cage, exited above the right hip, and lodged in the right arm. The projectile recovered from Dunkley's body was also determined to have been fired from a 9-mm handgun.

A few days after the murder, defendant was incarcerated in the Forsyth County jail on other charges. Defendant telephoned Anesha from jail and asked her to get the 9-mm Ruger from Gardner's apartment and take it to Tony Duncan. According to Duncan, he spoke with defendant on the telephone, and they agreed that Duncan could buy the handgun. Thereafter, on approximately 1 April 1996, a Winston-Salem police detective seized the 9-mm Ruger from Duncan in the course of his investigation of the Dunkley murder.

Special Agent Thomas Trochum of the North Carolina State Bureau of Investigation (SBI) performed a ballistics test on the 9-mm Ruger and compared it with the evidence seized in both the Griffin and Dunkley murder cases. In the Griffin case, Trochum examined three cartridge cases which were recovered from the crime scene and a bullet fragment which was removed from Griffin's head during the autopsy. After examining these items, he determined that each was fired by defendant's 9-mm Ruger to the exclusion of all other handguns. In the Dunkley case, Trochum examined a cartridge case recovered from the crime scene and two bullet fragments taken from Dunkley's body during the autopsy. Again, after inspecting these items, he determined that each was fired by defendant's 9-mm Ruger to the exclusion of all other handguns.

The two murder charges were joined for trial, and the trial began in Forsyth County on 3 November 1997. On 14 November 1997, the

jury found defendant guilty of one count of first-degree murder under the felony murder rule and a second count of first-degree murder under both premeditation and deliberation, and the felony murder rule. Thereafter, on 18 November 1997, the jury recommended death on both charges, and the trial court entered judgment accordingly. Defendant appeals to this Court as of right from the sentences of death.

## PRETRIAL ISSUE

[1] In defendant's first assignment of error, he contends the trial court erred by joining the Griffin and Dunkley cases for trial. On 25 July 1997, the trial court granted the State's motion to join both murder charges for trial pursuant to N.C.G.S. § 15A-926. Defendant contends the trial court's joinder of the two cases was error, and this error substantially prejudiced him from receiving a fair trial.

At the outset, we note that N.C.G.S. § 15A-926 provides:

> (a) Joinder of Offenses.—Two or more offenses may be joined in one pleading or for trial when the offenses, whether felonies or misdemeanors or both, are based on the same act or transaction or on a series of acts or transactions connected together or constituting parts of a single scheme or plan. Each offense must be stated in a separate count as required by G.S. 15A-924.

N.C.G.S. § 15A-926(a) (1997). In short, there must be some "transactional connection" between the two separate offenses in order for joinder to be proper. *State v. Silva*, 304 N.C. 122, 126, 282 S.E.2d 449, 452 (1981).

In addressing this issue, this Court has stated:

> In ruling upon a motion for joinder of offenses, the trial judge should consider whether the accused can be fairly tried if joinder is permitted. If joinder would hinder or deprive defendant of his ability to present his defense, the motion should be denied. *Pointer v. U.S.*, 151 U.S. 396 (1894); *State v. Davis*, 289 N.C. 500, 223 S.E.2d 296. However, it is well established that such a motion is ordinarily addressed to the sound discretion of the trial judge, and his ruling will not be disturbed absent a showing of abuse of discretion.

*State v. Greene*, 294 N.C. 418, 421-22, 241 S.E.2d 662, 664 (1978). Furthermore, one of the factors which may be considered to deter-

mine whether certain acts or transactions constitute "parts of a single scheme or plan" is the nature of the offenses. *Id.* at 422, 241 S.E.2d at 665; N.C.G.S. § 15A-926(a).

According to defendant, "any surface similarities between the Griffin and Dunkley matters were far outweighed by their differences, and the [t]rial [c]ourt's ruling improperly allowed the [p]rosecution to bootstrap the extremely weak Griffin case by trying it together with the Dunkley case." We disagree.

This Court rejected a similar argument in *State v. Chapman,* 342 N.C. 330, 464 S.E.2d 661 (1995), *cert. denied,* 518 U.S. 1023, 135 L. Ed. 2d 1077 (1996). In *Chapman,* the defendant was charged with the first-degree murders of two women in Hickory, North Carolina. Even though the murders occurred approximately two months apart, there were substantial similarities. The State moved to join the two cases for trial, and the defendant objected. Following a hearing, the trial court allowed the cases to be joined. The defendant was found guilty on both counts of first-degree murder and was sentenced to death. The defendant appealed to this Court from the two death sentences, contending the trial court erred by joining the two cases for trial "because the charges were not transactionally related, in that none of the witnesses testified concerning both the . . . murders, and the murders occurred approximately two months apart." *Id.* at 342, 464 S.E.2d at 668. This Court sustained the joinder of the two murder cases, holding:

> The facts incident to the two murders here reveal a common *modus operandi* and a temporal proximity sufficient to establish a transactional connection. Both victims were young women with drug habits; defendant knew both and had smoked crack with each. One victim was nude when found, and the other was nude from the waist down. Both victims suffered blunt-force injuries to their heads . . . . The women were killed within two months of each other, and their bodies were found in the lowest part of vacant houses within two blocks of each other.

*Id.* at 343, 464 S.E.2d at 668.

In the instant case, we find the following substantial similarities which justify joinder for trial: both were murders of young men whom defendant knew and with whom he was associated in the drug trade, both murders occurred after the victims had paged defendant, both victims were shot in the head with the same gun at a range of

approximately two feet or less, both murders occurred in Winston-Salem, both murders occurred on the premises of the victims, and both murders occurred after defendant argued with the victims. In light of this evidence, we conclude the trial court did not abuse its discretion by allowing the two murder charges to be joined for trial. After a careful review of the entire record, we hold the two offenses "were not so separate in time and place and so distinct in circumstance that joinder was unjust and prejudicial to defendant." *Id.* at 344, 464 S.E.2d at 669. Therefore, this assignment of error is overruled.

## JURY SELECTION

[2] In defendant's next assignment of error, he contends the trial court erred by allowing the State's challenge for cause of prospective juror James Henry, Jr., because of his views with regard to the possible imposition of capital punishment. This Court has long recognized the United States Supreme Court's decision in *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985), to be determinative in such cases. The United States Supreme Court articulated the standard to be applied in such situations as follows:

> whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that . . . this standard . . . does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law . . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 424-26, 83 L. Ed. 2d at 851-53 (footnotes omitted). Therefore, in such situations, we must defer to the discretion of the trial court in determining whether a prospective juror is unable to follow the law

with regard to the possible imposition of capital punishment unless a clear abuse of discretion is shown. *State v. Hill*, 347 N.C. 275, 288, 493 S.E.2d 264, 271 (1997), *cert. denied,* —— U.S. ——, 140 L. Ed. 2d 1099 (1998).

In the instant case, the transcript reveals unequivocally that prospective juror Henry responded affirmatively to the trial court's initial inquiry concerning his inability to impose the death penalty. The following exchange between the trial court and Henry demonstrates this bias:

THE COURT: Do . . . you have any personal, moral, or religious beliefs against the death penalty as a possible appropriate sentence for someone convicted of first degree murder?

MR. HENRY: I do.

THE COURT: Mr. Henry, you do?

MR. HENRY: Yes, ma'am.

THE COURT: Would it be impossible for you under any circumstances to vote for a sentence of death?

MR. HENRY: I don't think it would be impossible but that weighs heavy on my conscience, that particular thing.

THE COURT: All right, the law requires that [if] someone is convicted of first degree murder, the jury has to make the sentencing decision and I would give you instructions about aggravating circumstances and mitigating circumstances and weighing those and the burden of proof and such. Would you be able to follow those instructions about sentencing or are your personal views and reservations about the death penalty such that you would not be able to follow those instructions?

MR. HENRY: I might have some problems. My belief is the essence of who I am and what you say may conflict with what I believe, and then therefore that's going to put me in an awkward position.

THE COURT: Would your personal beliefs substantially impair your ability to follow the law that I would give you on the death penalty?

MR. HENRY: It may.

**STATE v. MOSES**

[350 N.C. 741 (1999)]

THE COURT: And you're saying that because you don't know what I'm going to tell you?

MR. HENRY: Yes, ma'am.

THE COURT: And if what I told you differed from what you believed about the death penalty, you would not be able to follow that law. Is that what you're saying?

MR. HENRY: Yes, ma'am.

Thereafter, defense counsel questioned Henry with regard to his personal views of the death penalty, and Henry repeatedly said it would be hard for him to sentence defendant to death because of his views. At one point, he stated:

MR. HENRY: I understand that I only can judge based upon the evidence that is presented but to me there could be things that were not said that could make the difference between being right and being wrong and when you put a man's life on the line like that, to me every avenue needs to be explored and the truth need [sic] to be brought out, no one side on part of it and don't tell you certain things about certain things and I know that's getting on into the trial. What I'm trying to say is that when you sentence a man to death, you need to be pretty sure within yourself that that man is guilty and is not lawyers running around, you know, confusing you or whatever. So I would have a problem, yes, ma'am. I would have a problem.

Thereafter, the trial court excused Henry for cause pursuant to N.C.G.S. § 15A-1212(8), stating:

He clearly indicated to me that if the law, as I instructed him, was different from his personal views about the death penalty, he would not be able to follow them and I think he gave some ambiguous answers otherwise but he was not ambiguous about that and his body language and looking at him as he answered the questions, while some of the words were ambiguous, I felt that his ability to follow the law as I would give it to him was substantially impaired so I wanted to—some of that was my looking at him and a lot of it was exactly what he said in response to my questions about following the law. I wanted to be sure that was clear.

After a careful review of the transcript, we conclude the trial court did not abuse its discretion in excusing Henry because of his

STATE v. MOSES

[350 N.C. 741 (1999)]

perceived inability to follow the law with regard to the possible imposition of capital punishment. The trial court, as well as defense counsel, thoroughly questioned Henry about his views, and in the trial court's sound discretion, Henry was not fit to serve on the jury. Therefore, this assignment of error is overruled.

[3] In defendant's next assignment of error, he contends the trial court violated the United States Supreme Court's mandate in *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992), by not allowing defendant's challenge for cause of prospective juror Terri Hendrix because of her views with regard to the possible imposition of capital punishment. In *Morgan*, the United States Supreme Court adopted a "life qualifying" or "reverse-*Witherspoon*" standard for such cases, holding:

> [a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

*Id.* at 729, 119 L. Ed. 2d at 502-03. However, we again note it is within the trial court's sound discretion to determine whether a prospective juror should be excused for cause. *Hill*, 347 N.C. at 288, 493 S.E.2d at 271.

During the *voir dire* of Hendrix, both the trial court and the prosecutor asked her on numerous occasions whether she was predisposed to automatically applying the death penalty in all first-degree murder cases. Hendrix responded negatively. Furthermore, both the trial court and the prosecutor inquired whether she could put her personal views aside and follow the trial court's instructions, applying the law to the facts presented, and consider a sentence of life imprisonment rather than the death penalty, to which she responded affirmatively. During his *voir dire* of Hendrix, defense counsel asked whether "there [was] anything in your personal beliefs that would prevent you from fully considering life without parole as a possible

punishment if we get that far," to which she responded "no." Thereafter, the following exchange occurred between defense counsel and Hendrix:

[DEFENSE COUNSEL]: Do you feel that in all cases of premeditated murder, if the jury so found, that the death penalty is the only possible appropriate punishment?

Ms. HENDRIX: Sometimes, yes.

. . . .

[DEFENSE COUNSEL]: So is it your opinion that if the jury in this case should find [defendant] guilty of at least one count of premeditated murder, that you would then automatically vote for death as a punishment?

Ms. HENDRIX: Yes.

[DEFENSE COUNSEL]: Your Honor, I'd offer her for cause.

The trial court then sought to clarify Hendrix's answer by asking the following:

THE COURT: Okay, Ms. Hendrix, the law would require you, even if you found the defendant guilty of first degree murder under the premeditation theory as you've just expressed, to consider both possible alternatives—life imprisonment without parole and the death penalty. Could you set aside your personal view that the death penalty should be imposed in all—

Ms. HENDRIX: —It depends on what the evidence is in the case and I've not heard anything so I don't know but my belief today is that I support the death penalty if it's premeditated. Now whether it's—now what the evidence that has been presented, I've not heard.

THE COURT: You would base your verdict on the evidence and the circumstances?

Ms. HENDRIX: Yes.

THE COURT: Would you be able to follow the law that I will give you on that?

Ms. HENDRIX: Yes.

THE COURT: And would you—you would not automatically impose the death penalty just because the defendant had

been found guilty of first degree murder? Is that right or is that wrong?

Ms. Hendrix: I mean that's an option I'd have, correct? Would that be an impose [sic]?

The Court: To impose it?

Ms. Hendrix: Yes.

The Court: Yes. But the law requires that you consider both options and that you not[] say going in, without knowing the circumstances, that you would automatically impose one or the other. Can you do that?

Ms. Hendrix: Well, I would like to think I could.

Defense counsel then continued his questioning of Hendrix as follows:

[Defense Counsel]: Do you think, Ms. Hendrix, based upon what you said in the last few minutes that if the defendant was found guilty of premeditated murder—not felony murder but premeditated and deliberated murder on at least one of these two cases—that the beliefs you have expressed a few minutes ago would substantially impair your ability to consider life without parole as opposed to the death penalty?

Ms. Hendrix: It may. I can't sit here and say it wouldn't.

[Defense Counsel]: You can't say that it wouldn't?

Ms. Hendrix: It wouldn't. I mean I can't sit here and say that I can go in—I think I can possibly consider it but I would be leaning more strongly towards the death penalty based on my beliefs.

[Defense Counsel]: Your Honor, I'd renew the challenge.

Thereafter, the trial court heard arguments from both sides on defendant's challenge for cause of Hendrix. The trial court then denied the challenge, stating:

She said she could follow the law. I know she certainly indicated a leaning one way or the other but the law doesn't prevent that but she indicated she could fairly consider both possibilities and I think she said any number of times it would depend on the circumstances so I'll deny that . . . .

Upon reexamination by defense counsel, Hendrix confirmed she did not have any preconceived notions, and could follow the trial court's instructions with regard to the possible penalties for first-degree murder.

Defendant contends it is "inescapable that Hendrix should have been excused for cause" because of her admitted tendency to "lean[] more strongly towards the death penalty." However, as previously noted, jurors cannot be asked enough questions to make their bias unmistakably clear because the jurors may not know how they will react or they may want to hide their true feelings. *Wainwright*, 469 U.S. at 424-25, 83 L. Ed. 2d at 852. Therefore, after careful consideration, we conclude the trial court did not err by denying defendant's challenge for cause of Hendrix based on her death penalty views. The trial court conducted a lengthy *voir dire* of the prospective juror and determined, in its sound discretion, she could follow the instructions and apply the law in an unbiased fashion. Finding no abuse of discretion on the part of the trial court, we overrule this assignment of error.

## GUILT-INNOCENCE PHASE

[4] In defendant's next assignment of error, he contends the trial court committed prejudicial error by allowing the prosecution to present evidence of the Griffin murder as Rule 404(b) evidence of the Dunkley murder, and vice versa. The trial court ruled the evidence was admissible under Rule 404(b) to show opportunity and identity. Defendant contends that neither case was probative of the other for any legitimate 404(b) purpose and amounted only to general bad character evidence. We disagree.

Rule 404(b) of the North Carolina Rules of Evidence reads as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (Supp. 1998). This Court has recognized that Rule 404(b) is a rule of inclusion rather than a rule of exclusion, holding:

Rule 404(b) state[s] a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.

*State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990).

Furthermore, in order to be admissible under Rule 404(b) on the issue of identity, "[t]he other crime may be offered on the issue of defendant's identity as the perpetrator when the *modus operandi* of that crime and the crime for which defendant is being tried are similar enough to make it likely that the same person committed both crimes." *State v. Carter*, 338 N.C. 569, 588, 451 S.E.2d 157, 167 (1994), *cert. denied*, 515 U.S. 1107, 132 L. Ed. 2d 263 (1995).

Defendant contends the only common element between the two murders was that they were committed with the same gun. However, as previously noted, the *modus operandi* of the two murders was similar enough to make it likely that the same person committed the two murders. The two victims were associates of defendant in the drug trade and were shot multiple times with the same gun. Witnesses testified the gun belonged to defendant. The victims were killed in the same manner and in the same city within a period of two months. Both victims argued with and paged defendant prior to their deaths. Griffin was seen with defendant prior to his death. Dunkley was to meet with defendant when last seen alive. Both men were murdered on their premises. These numerous similarities supported the trial court's 404(b) ruling.

It is significant that the same gun was used to commit both murders. In *State v. Garner*, 331 N.C. 491, 417 S.E.2d 502 (1992), this Court, under Rule 404(b), upheld the admission of testimony about an attempted murder occurring three weeks after the armed robbery and murder for which Garner was on trial. This Court held this evidence "tended to prove the defendant's possession and control of the weapon at a time close in proximity to that of the Harrelson murder." *Id.* at 509, 417 S.E.2d at 512. Similarly, in *State v. Abraham*, 338 N.C. 315, 451 S.E.2d 131 (1994), this Court approved the admission under Rule 404(b) of evidence of a felonious assault which occurred two months prior to the murder for which defendant was on trial. *Id.* at 337, 451 S.E.2d at 142. Additionally, in *State v. Hoffman*, 349 N.C. 167, 505 S.E.2d 80 (1998), *cert. denied*, —— U.S. ——, 143 L. Ed. 2d 522

(1999), a capital robbery-murder of a jewelry store owner, this Court approved the admission under Rule 404(b) of testimony about armed robberies of banks occurring in the months preceding the murder for the purpose of proving the identity of the perpetrator of the crimes. *Id.* at 184, 505 S.E.2d at 90. In each of these cases and in the instant case, the evidence established the same gun was used for both crimes.

In *State v. Howell*, 343 N.C. 229, 470 S.E.2d 38 (1996), the defendant was tried capitally for the murder of a twenty-nine-year-old prostitute. This Court considered whether the testimony of another woman, Ms. Farabee, about an encounter she had with the defendant several months prior to the murder was properly admitted under Rule 404(b). This Court found the factual similarities between the two crimes "so strikingly similar as to permit Farabee's testimony for the purpose of proving defendant's identity as well as showing a common opportunity, plan, and *modus operandi* to defendant's attacks." *Id.* at 236, 470 S.E.2d at 42. This Court noted the following similarities: both women were black prostitutes in Hickory, North Carolina; the murder victim was last seen near the location where the defendant had picked up Farabee; both women were bound (one with duct tape and one with wire); and objects were inserted into the vaginas of both women. In the instant case, there were even more similarities that made evidence of the Dunkley murder admissible as to the Griffin murder, and vice versa.

Despite the striking similarities between the two murders in the instant case, defendant argues the dissimilarities between the two murders preclude admission of the Rule 404(b) evidence. In *State v. Moseley*, 338 N.C. 1, 449 S.E.2d 412 (1994), *cert. denied*, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995), this Court addressed a similar argument as follows:

> We acknowledge, as defendant points out in his brief, that *there are dissimilarities between the crimes charged and defendant's conduct with Ms. Dawson.* Ms. Dawson was not beaten or strangled, the assaults on Ms. Dawson did not occur outdoors, and Ms. Dawson was not a stranger to defendant. *However, a prior act or crime is sufficiently similar under N.C.G.S. § 8C-1, Rule 404(b) to warrant admissibility if there are " 'some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both crimes.' " State v. Riddick,* 316 N.C. 127, 133, 340

S.E.2d 422, 426 (1986) (quoting *State v. Moore*, 309 N.C. 102, 106, 305 S.E.2d 542, 545 (1983)). *It is not necessary that the similarities between the two situations "rise to the level of the unique and bizarre." State v. Green*, 321 N.C. at 604, 365 S.E.2d at 593. Rather, the similarities must tend to support a reasonable inference that the same person committed both the earlier and later acts.

*Moseley*, 338 N.C. at 42-43, 449 S.E.2d at 437-38 (emphasis added).

Defendant claims that even if evidence of the other murder is admissible under Rule 404(b), it should have been excluded under Rule 403. Rule 403 of the North Carolina Rules of Evidence reads as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C.G.S. § 8C-1, Rule 403 (1992).

"The determination of whether relevant evidence should be excluded under Rule 403 is a matter that is left in the sound discretion of the trial court, and the trial court can be reversed only upon a showing of abuse of discretion." *State v. Hipps*, 348 N.C. 377, 405-06, 501 S.E.2d 625, 642 (1998), *cert. denied*, —— U.S. ——, 143 L. Ed. 2d 114 (1999). After careful review, we conclude defendant has shown no abuse of discretion in the trial court's ruling. For the reasons stated herein, this assignment of error is overruled.

[5] In defendant's next assignment of error, he contends the trial court erred by allowing the prosecution to present evidence of defendant's prior misconduct with a handgun, on the grounds that this evidence is irrelevant and served only to prejudice the jury against defendant. We disagree.

During the trial, the State presented the testimony of Steven Cherry, a former drug associate of defendant, in order to identify the murder weapon which the State contends was used by defendant in both murders. Cherry testified he had seen defendant on several occasions in possession of a gun very similar to the 9-mm Ruger which was used in both murders. Cherry further testified about an incident which occurred between defendant and him in November

1995, just weeks before the Griffin murder. Cherry testified defendant became very upset when Cherry told him he had been robbed of defendant's drugs and money. While defendant and Cherry were looking for the thieves, defendant pulled out his 9-mm Ruger, put it to Cherry's head, and threatened him. Defendant objected to this testimony, and a *voir dire* of the witness was conducted. Following arguments of counsel, the trial court allowed Cherry's testimony, stating, "I'll admit it for the purpose of showing—explaining why this witness remembers the gun but I don't expect to allow any arguments about prior similar acts and this somehow proving any other fact." Defense counsel then requested a limiting instruction, upon which the trial court reserved ruling. Defendant contends this evidence was inadmissible because it was irrelevant under Rule 401. Alternatively, defendant claims that regardless of whether the evidence was relevant, it nevertheless was highly prejudicial and should have been excluded under Rule 403.

Rule 401 of the North Carolina Rules of Evidence defines "relevant" evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Defendant bears the burden of proving the testimony was erroneously admitted and he was prejudiced by the erroneous admission. N.C.G.S. § 15A-1443(a) (1997). "The admission of evidence which is technically inadmissible will be treated as harmless unless prejudice is shown such that a different result likely would have ensued had the evidence been excluded." *State v. Gappins*, 320 N.C. 64, 68, 357 S.E.2d 654, 657 (1987).

In this case, the testimony about defendant's prior possession of the gun the State contends was the murder weapon was relevant. Cherry testified defendant was in possession of the 9-mm Ruger as recently as late October or early November 1995. The facts and circumstances of this incident were relevant and probative of the witness' identification of the weapon. The State was entitled to have the jury know the circumstances of the possession in order to allow the jury to judge the witness' credibility. The fact the gun was actually put to Cherry's head adds credence to his identification of the gun. The trial court indicated the testimony was being admitted for that purpose alone and would not be allowed to show defendant acted in conformity with this prior act.

STATE v. MOSES

[350 N.C. 741 (1999)]

Defendant also contends that even if the testimony was relevant, it should have been excluded under Rule 403 of the North Carolina Rules of Evidence. However, as this Court has stated:

Exclusion of evidence on the basis of Rule 403 is within the sound discretion of the trial court, and abuse of that discretion will be found on appeal only if the ruling is "manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision."

*State v. White,* 349 N.C. 535, 552, 508 S.E.2d 253, 264 (1998) (quoting *State v. Syriani,* 333 N.C. 350, 379, 428 S.E.2d 118, 133, *cert. denied,* 510 U.S. 948, 126 L. Ed. 2d 341 (1993)), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 67 U.S.L.W. 3772 (1999).

Furthermore, following the State's questioning, defense counsel elicited testimony from Cherry that he knew defendant was just kidding with him and that Cherry was not scared during this incident. Later in the trial, the trial court asked defense counsel if he would like a limiting instruction on this evidence. Defense counsel responded by stating, "[w]ell, Your Honor, quite frankly in light of his additional responses that he thought they were kind of just playing around anyway, I'm not sure it's necessary anyway." Defendant then withdrew his request for a limiting instruction.

As a result of the foregoing and the strong evidence of defendant's guilt in each of the murders, it is unlikely that a different result would have occurred had this evidence been excluded. Defendant has failed to meet the burden of proving that the testimony was erroneously admitted and he was prejudiced by the admission. Therefore, this assignment of error is overruled.

[6] In defendant's next assignment of error, he contends the trial court committed prejudicial error by allowing Trochum, an SBI ballistics expert, to state on cross-examination that any other competent expert would have reached the same conclusion. Defendant contends this testimony was nonresponsive to the question and was speculative. Following the State's direct examination of Trochum, the following cross-examination occurred between defense counsel and Trochum:

[DEFENSE COUNSEL]: So basically what you're saying what you did in this case to draw the conclusions that you testified to was to eyeball these various items at some unspecified magnification between five and 60 and then decide in your mind it was a match?

[TROCHUM]: No, sir. What I did here was I looked at them at a magnification that was sufficient to make an identification. It is not a routine standard procedure in our laboratory to record the magnification. It's not necessary to do so.

Secondly, it was not just that I eyeballed it. I looked at it and based on my experience and training came to the conclusion that any other competent firearms examiner would come to—

[DEFENSE COUNSEL]: —Objection to that, Your Honor.

THE COURT: Overruled. Go ahead.

[TROCHUM]: —and that is that these bullets and these cartridge cases matched the test and were indeed fired by State's Exhibit No. 1.

Defendant contends this testimony was irrelevant pursuant to Rule 401. At this point in questioning, Trochum was being cross-examined and challenged about his opinion. His comment was a statement of his confidence in his opinion in response to the challenge. After the trial court overruled the objection, defense counsel revisited the subject in the following exchange:

[DEFENSE COUNSEL]: Now I believe you testified a few minutes ago though that any other forensic firearms examiner would have reached the same conclusion. Is that what you said?

[TROCHUM]: I said any other firearms examiner who was of the same competent training and education would, yes, I'm sure reach the same conclusions.

[DEFENSE COUNSEL]: You're comfortable that the other 698 besides you and Agent Bishop would agree with you?

[TROCHUM]: That's correct.

Assuming *arguendo* that defendant did not waive his previous objection, defense counsel made the following remarks during his closing argument:

We are the SBI, we are experts. Every expert in the world—they said—would agree with us. Now that's enough right there to discredit their testimony because I suggest to you that there is no discipline out there—chemistry, law, medicine, philosophy, fingerprints, DNA—in which you can find every expert in the world that agrees. That's what they said, just like they said the bullets

matched this gun and none other in the world—the same phrase that they used and it doesn't make any sense. Nothing is that conclusive and certainly not somebody looking through a microscope with a five to sixty power microscope and that's all there was.

As a result of the foregoing, defense counsel actually turned Trochum's statement to his advantage and impeached him on that statement. Furthermore, in addition to Trochum's testimony, Agent Eugene Bishop testified he had reviewed the exact same evidence and had reached the same conclusions. Even if the testimony had been disallowed, there is no reasonable possibility the jury would have reached a different verdict. Therefore, this assignment of error is overruled.

[7] In defendant's next assignment of error, he contends the trial court erred by allowing witness Casey McCree to testify he was "pretty sure" defendant admitted to killing Griffin. Defendant claims this evidence is so vague and uncertain that it fails to meet the standards for relevance under Rule 401, it is unfairly prejudicial to defendant, and it should have been excluded under Rule 403.

According to McCree, he met defendant during the summer of 1995 and began selling drugs for defendant soon thereafter. When questioned about Griffin's death, McCree testified he saw defendant at the crime scene in a group of people who gathered to see what happened, and defendant stated that "whoever [killed Griffin] had to be smart, you know, cause they didn't get caught, they didn't leave no trace."

McCree further testified that sometime between Thanksgiving and Christmas of 1995, he and defendant were having a conversation about assassinations when the topic of Griffin's murder was raised. When McCree asked defendant if he knew who killed Griffin, defendant "looked at [him] and he kind of smiled and from that point, [McCree] knew that [defendant] did it." Thereafter, the following exchange, which is the subject of this assignment of error, occurred between the prosecutor and McCree:

[PROSECUTOR]: Now, Casey, do you recall what the defendant said exactly with respect to [Griffin]?

[MCCREE]: He looked at me and he kind of, you know, gave a smile and then he said in a roundabout way that he did do it. I can't—

STATE v. MOSES

[350 N.C. 741 (1999)]

[DEFENSE COUNSEL]: —Objection, Your Honor. Non-responsive.

[MCCREE]: —I can't quite figure the right words.

THE COURT: Well you can go into it with him on cross examination. If he didn't say anything, then the jury will disregard it.

[PROSECUTOR]: Casey, did he say anything to you after you asked the question about [Griffin]?

[DEFENSE COUNSEL]: Objection. Asked and answered, Your Honor.

THE COURT: Overruled. You may answer.

[PROSECUTOR]: Do you recall whether he actually verbalized the words to you?

[MCCREE]: Yes.

[PROSECUTOR]: Okay. He made statements to you other than just smiling? Is that correct?

[MCCREE]: He made a statement.

[PROSECUTOR]: Okay. Can you remember the gist of the statement? If you can't remember the exact words, can you remember some of the words or what he was saying to you.

[MCCREE]: After he smiled, you know, I don't know. I don't want to say anything he didn't tell. He said that I did it—him. Talking about him, you know. He said those words but—

[PROSECUTOR]: —The defendant said those words?

[MCCREE]: He said that he had did it but the way that he had put it it was like, you know, it was justifiable for him doing it. I mean, I don't—

[DEFENSE COUNSEL]: —Objection, Your Honor.

THE COURT: Overruled.

[MCCREE]: —I don't recall the whole statement that he made but I'm pretty sure that he told me that he did it.

[DEFENSE COUNSEL]: Objection, Your Honor. Pretty sure?

THE COURT: Overruled.

As a result of the foregoing, McCree reiterated that although he did not remember the exact words defendant used, he did say something about killing Griffin. McCree was certain defendant made a statement to him admitting killing Griffin. He was only uncertain about the exact words defendant used, was making an effort to be truthful, and did not want to attribute anything to defendant that he did not say.

Defendant contends the trial court erred by admitting this testimony because of McCree's uncertainty. However, an identification of the perpetrator of a crime is not inadmissible because the witness is not absolutely certain of the identification, so long as the witness had a " 'reasonable possibility of observation sufficient to permit subsequent identification.' " *State v. Turner*, 305 N.C. 356, 363, 289 S.E.2d 368, 372 (1982) (quoting *State v. Miller*, 270 N.C. 726, 732, 154 S.E.2d 902, 906 (1967)). Such uncertainty goes to the credibility and weight of the testimony, and it is well established that "[t]he credibility, probative force, and weight [of the testimony are] matter[s] for the jury." *Queen City Coach Co. v. Lee*, 218 N.C. 320, 323, 11 S.E.2d 341, 343 (1940).

Furthermore, defendant contends the statement was irrelevant and should have been excluded pursuant to Rule 401. As previously noted, Rule 401 defines "relevant" evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401. In the instant case, McCree's testimony was relevant to the issue of the identification of defendant as the perpetrator of Griffin's murder. As the trial court instructed, the witness' doubt was a factor for the jury to consider. Therefore, this assignment of error is overruled.

## CAPITAL SENTENCING PROCEEDING

[8] In defendant's next assignment of error, he contends the trial court erred in the capital sentencing proceeding of both cases by admitting evidence of the other murder in each case to support the N.C.G.S. § 15A-2000(e)(11) course of conduct aggravating circumstance. The course of conduct circumstance was the sole aggravating circumstance submitted in the Griffin case and was one of two circumstances submitted in the Dunkley case.

Similar to defendant's argument with regard to joinder of the two cases for trial, defendant claims the Griffin and Dunkley murders

were significantly different and were not linked by any common *modus operandi.* According to defendant, the Griffin and Dunkley murders were fundamentally different types of killings, and the sole point of similarity between the killings was the ballistics evidence that both crimes were committed with the same handgun. We disagree.

N.C.G.S. § 15A-2000(e)(11) provides that jurors in a capital sentencing proceeding may consider other violent criminal conduct as part of a course of conduct, and therefore an aggravating circumstance, when "[t]he murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons." N.C.G.S. § 15A-2000(e)(11) (1997); *see State v. Cummings,* 332 N.C. 487, 508, 422 S.E.2d 692, 704 (1992) (*Cummings I*). In *State v. Cummings,* 346 N.C. 291, 488 S.E.2d 550 (1997) (*Cummings II*), *cert. denied,* —— U.S. ——, 139 L. Ed. 2d 873 (1998), this Court defined the requisite factors necessary for the submission of course of conduct in support of a sentence of death as follows:

> Submission of course of conduct requires that "there is evidence that the victim's murder and the other violent crimes were part of a pattern of intentional acts establishing that in defendant's mind, there existed a plan, scheme or design involving the murder of the victim and the other crimes of violence." *State v. Walls,* 342 N.C. 1, 69, 463 S.E.2d 738, 775 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 794 (1996). This Court has refused to require a conviction of the offense before the State may use that offense to establish the course of conduct aggravating circumstance. *See State v. Williams,* 305 N.C. 656, 292 S.E.2d 243 (course of conduct aggravator in defendant's conviction of a robbery-murder supported by evidence of a robbery-murder that was committed three hours later without any evidence of whether defendant was convicted of those offenses), *cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982); *State v. Moseley,* 336 N.C. 710, 445 S.E.2d 906 (1994) (evidence of unadjudicated murder and rapes in another county that occurred three months before the murder for which defendant had been convicted admissible to support course of conduct aggravator), *cert. denied,* 513 U.S. 1120, 130 L. Ed. 2d 802 (1995).

> In determining whether there is sufficient evidence to submit an aggravating circumstance to the jury, the trial court must con-

STATE v. MOSES

[350 N.C. 741 (1999)]

sider the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving all contradictions in favor of the State. *State v. Skipper*, 337 N.C. 1, 53, 446 S.E.2d 252, 281 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). " 'If there is substantial evidence of each element of the [aggravating] issue under consideration, the issue must be submitted to the jury for its determination.' " *State v. Gregory*, 340 N.C. 365, 411, 459 S.E.2d 638, 664 (1995) (quoting *State v. Moose*, 310 N.C. 482, 494, 313 S.E.2d 507, 516 (1984)), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 478 (1996). In determining whether the evidence tends to show that another crime and the crime for which defendant is being sentenced were part of a course of conduct, the trial court must consider a number of factors, including the temporal proximity of the events to one another, a recurrent *modus operandi*, and motivation by the same reasons.

*Cummings II*, 346 N.C. 328-29, 488 S.E.2d at 572.

Furthermore, in *Cummings I*, 332 N.C. 487, 422 S.E.2d 692, this Court considered whether the course of conduct aggravating circumstance had properly been submitted in a case involving two murders that occurred twenty-six months apart. This Court held temporal proximity ordinarily affects weight rather than admissibility. *Id.* at 510, 422 S.E.2d at 705. Additionally, this Court determined the common *modus operandi* and similar motivations justified the submission of N.C.G.S. § 15A-2000(e)(11). *Id.* at 512, 422 S.E.2d at 706.

As previously noted in *Chapman*, 342 N.C. 330, 464 S.E.2d 661, this Court approved the joinder of two separate murders which occurred approximately two months apart. This Court further upheld the submission of N.C.G.S. § 15A-2000(e)(11) based on the similarities of the two murders, holding:

[S]everal similarities tie the instant murders together and suggest a common motivation or *modus operandi*. The victims were young women with drug habits; defendant knew both and had smoked crack with each. Their bodies were disposed of in virtually the same fashion and within two blocks of each other. Both victims suffered blunt-force injuries to their heads. Defendant was seen with, and had sex with, Conley shortly before her death; he made incriminating statements to three people about having killed Ramseur. Defendant had a foreboding attitude toward

women when he was smoking crack. These similarities supported the finding of a transactional connection for purposes of joinder, and, considering the evidence in the light most favorable to the State, they also supported the submission and finding of the course of conduct aggravating circumstance.

*Id.* at 345-46, 464 S.E.2d at 670.

In the instant case, as previously noted, we hold a common *modus operandi* and motivation existed between the Griffin and the Dunkley murders. Further, although the murders occurred two months apart, this goes to the weight rather than the admissibility of the evidence.

After careful review of the instant case, we hold the similarities in the two murders demonstrate there did exist in the mind of defendant a plan, scheme, or design involving the two violent crimes. Therefore, the trial court did not err by submitting the N.C.G.S. § 15A-2000(e)(11) course of conduct aggravator. This assignment of error is overruled.

[9] In defendant's next assignment of error, he contends the trial court committed prejudicial error by allowing the prosecutor to cross-examine defendant's sentencing expert regarding the amount he had been paid in past court-appointed cases. At sentencing, the defense called Dr. Jerry Noble, a clinical psychologist, to testify regarding psychological mitigating circumstances. On direct examination, Noble testified defendant suffered from a mental or emotional disorder at the time of the Griffin and Dunkley murders and as a result, defendant's capacity to conform his conduct to the requirements of law was impaired. On cross-examination, the State questioned Noble about his fee in the instant case and previous cases, including how many times he had testified in the last two years and how much money he had been paid to testify in those cases. Defendant contends this line of questioning was totally irrelevant to the case before the jury and served only to inflame the passions of taxpaying citizens. Further, defendant asserts the cross-examination was improper because the jurors, as taxpayers, would be prejudiced against Noble's testimony. We disagree.

At the outset, we note that in a sentencing hearing, the Rules of Evidence do not apply. N.C.G.S. § 8C-1, Rule 1101(b)(3) (1992). The trial court has broad discretion concerning the scope of cross-examination, and this discretion is not limited by the Rules of

Evidence. *State v. Warren*, 347 N.C. 309, 317, 492 S.E.2d 609, 613 (1997), *cert. denied,* —— U.S. ——, 140 L. Ed. 2d 818 (1998). "Generally, the scope of permissible cross-examination is limited only by the discretion of the trial court and the requirement of good faith." *State v. Locklear*, 349 N.C. 118, 156, 505 S.E.2d 277, 299 (1998), *cert. denied,* —— U.S. ——, 143 L. Ed. 2d 559 (1999). This Court has repeatedly held cross-examination of an expert regarding compensation is permissible. *See, e.g., State v. Atkins*, 349 N.C. 62, 83, 505 S.E.2d 97, 111 (1998), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 67 U.S.L.W. 3732 (1999); *State v. Creech*, 229 N.C. 662, 671, 51 S.E.2d 348, 355 (1949). Such cross-examination is allowed "to test the bias or partiality of the witness towards the party by whom he was called or introduced." *Creech*, 229 N.C. at 671, 51 S.E.2d at 355.

In *State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542 (1994), *cert. denied,* 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995), this Court allowed the prosecutor's questioning of the defendant's mental health expert which revealed: (1) he testified only for defendants; (2) he had diagnosed ninety percent of them with psychological problems; and (3) he billed at a rate of $120 per hour, with the trial court setting his fee. *Id.* at 89-90, 446 S.E.2d at 553-54.

Further, in *State v. Brown*, 335 N.C. 477, 439 S.E.2d 589 (1994), this Court held:

> "[W]here evidence of bias is elicited on cross-examination the witness is entitled to explain, if he can, on redirect examination, the circumstances giving rise to bias so that the witness may stand in a fair and just light before the jury." *State v. Patterson*, 284 N.C. 190, 196, 200 S.E.2d 16, 20 (1973); *see also State v. Hicks*, 233 N.C. 511, 64 S.E.2d 871, *cert. denied,* 342 U.S. 831, 96 L. Ed. 629 (1951).
>
> If defendant believed at trial that the circumstances surrounding the retention and payment of the expert witness were such that the jury would have inferred no bias on his part, he was free to demonstrate this through redirect examination.

*Brown*, 335 N.C. at 493, 439 S.E.2d at 599.

In the instant case, the cross-examination of Noble was proper to allow the jury to assess his credibility in light of his status as a paid expert witness for the defense. The prosecutor was properly allowed to explore the expert's bias. Furthermore, defendant did not choose

to establish that the witness was not biased toward defendant through redirect examination. As such, this assignment of error is overruled.

**[10]** In defendant's next assignment of error, he contends the trial court erred in allowing the prosecution to cross-examine defendant's expert psychologist about the contents of a book bag found in the trunk of defendant's automobile. Prior to trial, defendant moved *in limine* to exclude evidence of certain materials found in defendant's book bag following the automobile crash in which Grenecia Givens was killed. The trial court deferred ruling until such time as the State chose to offer the exhibits into evidence. The materials included a handwritten notebook referring to certain infamous "serial killers" throughout history. While the prosecution was allowed to allude to the contents of the book bag during its guilt phase presentation, the specifics of the "serial killer" references were not mentioned. Defendant contends the sentences of death were tainted by the trial court's error. In addition, defendant claims the prosecutor's effort to link defendant with "serial killers" was an attempt to induce the jury to make its decision between life and death in a manner prohibited by Rule 403. We disagree.

As noted above, Noble testified on defendant's behalf. On direct examination, Noble testified extensively about defendant's life from birth and early childhood. Defense counsel sought to elicit evidence of psychological mitigating circumstances from Noble. Noble testified defendant had five previous psychological evaluations. One of those evaluations indicated defendant in the past had tried to "make himself appear as a powerful criminal with a threatening, dangerous organization behind him." Noble testified about defendant's mental state at the time he committed these murders and about personality testing he conducted on defendant. Noble concluded defendant had a severe, complicated mixture of personality problems. He testified defendant's problems "might include ideas to do things that are violent."

This Court has previously held:

[I]n order to prevent an arbitrary or erratic imposition of the death penalty, the state must be allowed to present, by competent relevant evidence, any aspect of a defendant's character or record and any of the circumstances of the offense that will substantially support the imposition of the death penalty.

*State v. McDougall,* 308 N.C. 1, 23-24, 301 S.E.2d 308, 322, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 173 (1983).

Defendant claims the cross-examination of Noble about the materials contained in defendant's notebook violated Rule 403. However, as previously noted, the Rules of Evidence do not apply to sentencing proceedings. N.C.G.S. § 8C-1, Rule 1101(b)(3). Furthermore, in *Cummings II,* 346 N.C. 291, 488 S.E.2d 550, the defendant contended Rule 403 prohibited the introduction of certain evidence. This Court rejected that contention, holding the trial court was not required to conduct the Rule 403 balancing test because the Rules of Evidence were inapplicable. *Id.* at 330, 488 S.E.2d at 573.

As a result of the foregoing, the State was entitled to cross-examine Noble about how the entries in defendant's notebook supported or refuted Noble's findings. The prosecutor asked Noble whether "things like this would be indicative of what this man collects and thinks about." The list of serial killers defendant possessed near the time of the two murders was relevant for cross-examination of the mental health expert. The jury was entitled to know to what extent, if any, these materials entered into the expert's opinion regarding defendant's state of mind at the time of the crimes. Therefore, the trial court did not err by allowing this cross-examination. This assignment of error is overruled.

## PROPORTIONALITY REVIEW

[11] Finally, defendant contends the death sentences imposed were excessive or disproportionate. Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, it is our statutory duty to ascertain as to each murder (1) whether the evidence supports the jury's findings of the aggravating circumstance or circumstances upon which the sentence of death was based; (2) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1997).

In the instant case, defendant was convicted of two counts of first-degree murder. In the first count, the Griffin murder, the conviction was based on the felony murder rule. In the second count, the Dunkley murder, the conviction was based on both premeditation and deliberation, and the felony murder rule. Following a capital sentenc-

ing proceeding as to each murder, the jury found the following submitted aggravating circumstance: this murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against other persons. N.C.G.S. § 15A-2000(e)(11). In the Dunkley murder, the jury further found the following submitted aggravating circumstance: this murder was committed while defendant was engaged in the commission of a robbery with a dangerous weapon. N.C.G.S. § 15A-2000(e)(5).

As to each murder, four statutory mitigating circumstances were submitted for the jury's consideration, but were not found: (1) the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (2) defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6); (3) defendant's age at the time of the crime, N.C.G.S. § 15A-2000(f)(7); and (4) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence which the jury deemed to have mitigating value, N.C.G.S. § 15A-2000(f)(9). As to each murder, of the eleven nonstatutory mitigating circumstances submitted, four were found by the jury to exist and have mitigating value.

After a thorough review of the record, including the transcripts, briefs, and oral arguments, we conclude the evidence fully supports the aggravating circumstances found by the jury. Further, we find no indication the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

The purpose of proportionality review is to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). In conducting proportionality review, we compare the present case with other cases in which this Court has concluded the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). This Court has determined the death sentence to be disproportionate on seven occasions: *State v. Benson,*

323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. First, defendant was convicted of two counts of first-degree murder. This Court has never found a sentence of death disproportionate in a case where the jury has found a defendant guilty of murdering more than one victim. *State v. Goode*, 341 N.C. 513, 552, 461 S.E.2d 631, 654 (1995). In addition, the jury convicted defendant for the Dunkley murder under the theory of premeditation and deliberation. This Court has stated "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Finally, in each murder, the jury found the following aggravating circumstance: "The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons." N.C.G.S. § 15A-2000(e)(11). There are four statutory aggravating circumstances which, standing alone, this Court has held sufficient to support a sentence of death. *Bacon*, 337 N.C. at 110 n.8, 446 S.E.2d at 566 n.8. The N.C.G.S. § 15A-2000(e)(11) course of conduct circumstance, which the jury found here, is among them. *Id.*

We also compare this case with the cases in which this Court has found the death penalty to be proportionate. While we review all of the cases in the pool of "similar cases" when engaging in our statutorily mandated duty of proportionately review, we reemphasize that we will not undertake to discuss or cite all of those cases each time we carry out that duty. *State v. Williams*, 308 N.C. 47, 81, 301 S.E.2d 335, 356, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983). It suffices to say this case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found it disproportionate.

Accordingly, we conclude defendant received a fair trial and capital sentencing proceeding, free from prejudicial error, and the sentences of death recommended by the jury and entered by the trial court are not disproportionate.

NO ERROR.