STATE OF NORTH CAROLINA
v.
JAMES FRANKLIN MICHAUX, Defendant.
No. COA06-1040
Court of Appeals of North Carolina.
Filed August 7, 2007
This case not for publication
Attorney General Roy Cooper, by Special Deputy Attorney General James P. Longest, Jr., for the State.
Richard E. Jester for defendant-appellant.
GEER, Judge.
Defendant James Franklin Michaux appeals from his convictions for first degree murder of his seven-month-old son, J.T.M., and felony child abuse inflicting serious bodily injury. With respect to defendant's contentions on appeal regarding the admissibility of various testimony, we hold that defendant either himself elicited that testimony or has failed to demonstrate that he was prejudiced by the testimony. We have further concluded that, contrary to defendant's position, the trial court properly instructed the jury regarding admissions since statements made by defendant to his wife and to a social worker qualified as admissions. Accordingly, we hold defendant received a trial free of prejudicial error.

Facts
At trial, the State's evidence tended to show the following facts. In 2002, the Rockingham County Department of Social Services ("DSS") began providing treatment services to defendant; his wife, Serita Michaux; and their two young children. Later in 2002, Ms. Michaux gave birth to twins, one of whom was J.T.M. The social worker assigned to the family testified regarding defendant's domination of Ms. Michaux and his hostility to receiving assistance from DSS.
On one occasion, after J.T.M.'s birth, a restaurant owner, who had known defendant since he was a young boy, observed defendant playing too roughly with the child. After she told defendant, "you're going to hurt that baby," defendant responded: "It's my damn baby. I'll do what I want to." When defendant learned that an employee of the restaurant had urged Ms. Michaux to leave him, defendant threatened to slap the employee and said, "Bitch, . . . I'll burn your house down with you in it."
Following a DSS safety assessment during which defendant was "explosive," DSS concluded that the environment for defendant's children was "unsafe" and, on 25 October 2002, placed J.T.M. and his twin with a foster family. In mid-February 2003, defendant and Ms. Michaux were allowed to have the twins for intermittent trial placements. After one such trial placement, J.T.M. returned to the foster family with noticeable scabbing and bruise marks, including bruising on his abdomen, groin area, and the backs of his thighs. Nonetheless, on 24 March 2003, physical custody of the twins was restored to defendant and Ms. Michaux. Shortly thereafter, on 8 April 2003, J.T.M. was admitted to Morehead Memorial Hospital. Nurse Amy White and other hospital staff examined J.T.M. and observed that he suffered from critical dehydration, a rash on his bottom, and bloody tissue around his rectum. According to Nurse White, J.T.M. was not behaving like a six-month-old, but rather "more like two months" because "he wouldn't lift his head up[,] he wouldn't try to lift his arms[,] he wouldn't put his eyes on you . . .[;] [h]e was just totally weak." X-rays taken at that time showed fractures to J.T.M.'s ninth and eleventh ribs that could have been caused by squeezing or a blow.
On 15 May 2003, emergency personnel were dispatched to defendant's residence at about 10:30 p.m. for a "cardiac respiratory emergency." When Chief Frazier of the Colfax Fire Department arrived, Ms. Michaux directed him to the back room of the house where defendant was holding J.T.M. When Chief Frazier took the child, he found no pulse and began CPR. Paramedic David Wilkins of the Guilford County Emergency Medical Services attempted to intubate the child in order to provide a direct line of air into the child's lungs. There was no obstruction in the airway prior to the intubation attempt. When J.T.M. could not be revived at the scene, he was transported to High Point Regional Hospital.
When the child arrived shortly after 11:00 p.m. at the hospital, Nurse Misty Hooper noticed that the baby had bruising on the left side of his head, down the left side of his abdomen, on his right lower back, on his leg, and around his diaper line. The child's foot also appeared as if "several layers of skin . . . had been peeled back," and his rectum "was macerated . . . very abnormal appearing . . . [r]aw, almost." Defendant and Ms. Michaux were asked by hospital staff about J.T.M.'s medical history, but they refused to provide the hospital staff with any information. Emergency room physician Dr. David Fisher unsuccessfully tried to resuscitate J.T.M. and then pronounced the seven-month-old dead.
Defendant was subsequently interviewed at the hospital by Rhonda Oboh, a social worker with the Guilford County Department of Social Services. He told Ms. Oboh "that he was feeding the child and playing with the child and then the child all of a sudden went limp." Defendant claimed that "he went to stick the bottle in the baby's mouth, and that the child would not take the bottle, and that at that point he knew that something was wrong." Defendant stated that he panicked, attempted CPR, and began tapping the child on his stomach, legs, and chest in order to get the child to respond.
Dr. John D. Butts, Chief Medical Examiner for the State of North Carolina, performed an autopsy of the victim on 16 May 2003. Dr. Butts observed a number of injuries on the child's body: bruises on the chin, forehead, chest, lower abdomen, and legs; tissue loss on the heel; both fresh and healing fractures to several ribs; and bruising in the wall of the small bowel and mesentery. Dr. Butts believed that "these injuries are all blunt force injuries," that "a child of this age isn't capable of incurring these injuries by itself," and that they "were caused by another party." Based on his findings, Dr. Butts concluded that the victim exhibited signs of "battered child syndrome."
In September 2004, defendant was indicted for felony child abuse inflicting serious bodily injury and first degree murder. A superseding indictment on the felony child abuse charge was filed in August 2005. The case proceeded to trial during the 31 October 2005 criminal session of Guilford County Superior Court.
Ms. Michaux, who was herself indicted on murder and child abuse charges, testified at defendant's trial pursuant to a plea agreement. According to Ms. Michaux, on the morning of J.T.M.'s death, she and defendant went to court and regained legal custody of their four children. Later in the day, the family accompanied defendant to his workplace. When the family returned home around 10:00 p.m., Ms. Michaux saw defendant take J.T.M. into the bedroom. After putting food in the oven for the older two children, Ms. Michaux went back to the bedroom and saw defendant choking the victim with his left hand. Ms. Michaux testified that she told defendant to stop, but defendant replied "it was his kid[,] he could do what he wanted to."
Ms. Michaux left the room to get laundry. She then heard defendant yell that the baby was not breathing. In response, Ms. Michaux called 911. According to Ms. Michaux, defendant instructed her to never tell anyone about what happened the night of J.T.M.'s death. Ms. Michaux testified further that she did not tell the emergency personnel about defendant's choking J.T.M. because she was scared of her husband. She stated that her husband had, in the past, choked her, threatened her with a jigsaw, kicked her in the leg with steel-toed boots, broken a picture over her head, thrown a glass at her, and hit her in the stomach when she was pregnant with the twins.
During her testimony, Ms. Michaux also described various instances of defendant's physical abuse of J.T.M. before the night of his death. Defendant gave J.T.M. blood blisters by smacking his feet with a remote control; burned the victim's ear with a lit cigarette; held the child's nose shut so he could not breathe; and taped the child to the rails of his crib with black tape in order to keep him still while he pushed on his stomach and smacked his face.
Dr. Butts testified at trial that he reached an initial conclusion, following his autopsy, regarding the cause of death:
My opinion  based on the constellation of injuries I saw and the lack of any obvious natural process, congenital disease or something that might explain the death, it was my opinion and feeling this child had died as a result of external forces or causes of some type. But I didn't  I was unable to identify a specific mechanism by which the child had died or had been killed.
Dr. Butts testified that he subsequently received additional information that prompted him to reassess his initial opinion. Based on this new information, Dr. Butts revised his initial opinion to reflect that "the death was the result of asphyxiation or consistent with asphyxiation" secondary to neck compression. During cross-examination by defendant's counsel, Dr. Butts explained that the information was from a written statement provided by Ms. Michaux to the police that indicated she saw defendant choke the victim in the bedroom on the night of 15 May 2003.
At trial, defendant offered evidence from several witnesses. Dr. Donald Jason, a professor in pathology who reviewed Dr. Butts' autopsy records, disputed Dr. Butts' diagnosis of battered child syndrome and testified that all the evidence was "perfectly consistent with the child choking on formula." He explained further that "[a]ny attempt at CPR . . . would be expected to leave some bruising, depending on how forceful it was. And I found some bruising . . . consistent with two fingers over the child's abdomen." Dr. Jason went on: "In any case, this is not a child that died of being beaten to death. This is a child that apparently asphyxiated to death in some manner, although not by strangulation . . . ."
In addition, defendant presented evidence that Ms. Michaux had stated, on the night of J.T.M.'s death, that defendant was innocently trying to feed the child when he stopped breathing. Other witnesses testified that defendant was gentle with the children and a good parent, with any bruising on the child coming from one of the older Michaux children playing roughly around the child. The jury found defendant guilty of felony child abuse inflicting serious bodily injury and first degree murder. On 8 November 2005, the trial court sentenced defendant to life imprisonment without parole for the murder conviction and to a term of 100 to 129 months imprisonment for the felony child abuse conviction. Defendant timely appealed to this Court.

I
Defendant first argues that the trial court erred in allowing Dr. Butts to testify as to his revised opinion that the victim's "death was the result of asphyxiation or consistent with asphyxiation" secondary to neck compression. Anticipating that the State would seek to introduce evidence of Dr. Butts' revised opinion, defendant made a motion in limine to exclude it. After a voir dire examination of Dr. Butts, the trial judge ruled:
With respect to the defendant's motion in limine about Dr. Butts' testimony, I will allow him to testify about his revised cause-of-death conclusion. However, I will limit that testimony with respect to the information that he received that prompted him to make that revised conclusion.
He will not be allowed to testify on direct examination about the fact that that statement came from Serita Michaux or that the statement was that the defendant was the one who was "choking" the victim in this case.
Defendant contends that, despite the court's narrowly-tailored ruling, the admission of Dr. Butts' revised opinion had the effect of impermissibly bolstering the credibility of Ms. Michaux and suggests, moreover, it was "unfair for a medical expert to change his opinion with no other basis than a statement of an accused codefendant."
Contrary to defendant, we discern no prejudicial error because defendant himself created the prejudice of which he now complains. Following its motion in limine ruling, the trial court remarked to defense counsel: "whether or not you want to get into the specifics of [the source of the information] on cross and use [Dr. Butts] as a vehicle to attack Serita Michaux's credibility, that's up to you." This strategy is exactly what defendant's counsel elected to do.
During the direct examination of Dr. Butts, the prosecution fully complied with the court's ruling, and no mention was made that Ms. Michaux was the source of the information relied upon by Dr. Butts. On cross-examination, however, defense counsel elicited the following testimony:
Q. Specifically, is the information you used to change your opinion statements that were made by Serita Michaux?
A. That's my understanding.
Q. The mother of the child?
A. Yes, sir.
Q. And is one of the statements that you used to change your opinion "When I got to the door, I never went inside the bedroom `cause I seen [defendant] choking [J.T.M.] with one of his hands. Not both hands. [Defendant] was lying on the bed next to [J.T.M.] and I got scared, because I seen [J.T.M.'s] tongue hanging out of his mouth"?
Is that one of the statements you used to change your opinion?
A. Yes, sir.
Had defendant chosen not to introduce Ms. Michaux's name during cross-examination, the source of Dr. Butts' "additional information" would have remained entirely unknown to the jury. Further, not only did defendant's counsel introduce Ms. Michaux as the source of the information, but he even read directly from Ms. Michaux's statement to the police.
Thus, any bolstering of Ms. Michaux's credibility resulted from the cross-examination and not the direct examination. Under these circumstances, any prejudice suffered by defendant is not remediable on appeal because it resulted from his own trial tactics. See State v. Mitchell, 342 N.C. 797, 806, 467 S.E.2d 416, 421 (1996) ("[D]efendant contends that statements made by Detective Harris . . . were hearsay. However, while the statement made by Detective Harris was hearsay, it was elicited from Detective Harris by defense counsel. Defendant cannot assign error to hearsay testimony which he elicited."); N.C. Gen. Stat. § 15A-1443(c) (2005) ("A defendant is not prejudiced . . . by error resulting from his own conduct."). Moreover, defendant used Dr. Butts' opinion regarding asphyxiation to anticipate the defense theory  later put forth by Dr. Jason _ that J.T.M. likely died from choking on baby formula. We, therefore, overrule this assignment of error.
We decline to address defendant's separate contention that, aside from the credibility issue, it is somehow "unfair for a medical expert to change his opinion with no other basis than a statement of an accused codefendant." Defendant cites no authority to support this proposition and, therefore, any such argument is abandoned. N.C.R. App. P. 28(b)(6) ("Assignments of error . . . in support of which no reason or argument is stated or authority cited, will be taken as abandoned.").

II
Defendant next argues that the trial court erred in allowing Dr. James Hilkey, a psychologist who had evaluated Ms. Michaux, to testify in a manner that bolstered Ms. Michaux's credibility. Defendant points to the following testimony, addressing whether Ms. Michaux would lie to protect her husband: "It does not surprise me that Ms. Michaux would lie. Again, this is a person who has many, many deficits, many, many inadequacies, and is extremely insecure. And if she believes that lying would get her what she believes she needs, I think that she would do it." Defendant maintains that Dr. Hilkey's testimony suggested "that Serita Michaux is now telling the truth, because she was lying before."
Assuming arguendo that the admission of Dr. Hilkey's testimony was error, we fail to perceive how defendant was prejudiced by it. During closing argument, defense counsel exploited this testimony in defendant's favor:
And you know, the State, through their own evidence, told you exactly why Serita Michaux was not telling the truth.
Remember Dr. Hilkey? The last thing Dr. Hilkey said when he left the witness stand?
In my opinion, I have no doubt  in my opinion, I have no doubt that she believes that lying  I have no doubt if she believed that lying will get her what she needs, that there's no doubt that she'd do it. She'd lie to get whatever she needs.
And that was their witness. Not mine. Last thing he said.
. . . .
So when do you first hear these stories? When she's in jail. And when, I contend to you, she wants to get out of jail. Then you have these three or four, five stories that she tells Detective Rogers. That's the first time you hear them.
Why do you hear those? Because she needed to get something. She needed to get out of jail. So here comes the stories.
Thus, defendant took full advantage of Dr. Hilkey's disputed testimony to undermine Ms. Michaux's credibility.
"A defendant is prejudiced by errors . . . when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a). In light of the fact that defendant found much to be gained from the precise testimony of Dr. Hilkey now challenged on appeal, we hold that defendant has failed to demonstrate the prejudice required under N.C. Gen. Stat. § 15A-1443(a). See State v. Moses, 350 N.C. 741, 765, 517 S.E.2d 853, 868 (1999) (rejecting argument that defendant was prejudiced by inadmissible testimony of expert witness in part because "defense counsel actually turned [expert's] statement to his advantage and impeached him on that statement" during closing argument), cert. denied, 528 U.S. 1124, 145 L. Ed. 2d 826, 120 S. Ct. 951 (2000). This assignment of error is overruled.

III
Defendant next argues that the court erred in allowing Amy White, a registered nurse, to testify on redirect examination as to possible causes of the various conditions afflicting J.T.M. when he was hospitalized in April 2003, the month prior to his death. Defendant contends that Nurse White's statements were improper lay opinion testimony since she had not been qualified as an expert witness.
We need not decide whether Nurse White could properly give opinion testimony of the type offered here because defendant "opened the door" to testimony by her as to possible causes of the child's condition. As our Supreme Court has explained:
[T]he law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself. Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially.
State v. Albert, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981).
When Nurse White testified on direct examination, the prosecutor limited her testimony to the physical symptoms exhibited by the child. On cross-examination, however, defense counsel went beyond the observable conditions and inquired whether there might be innocent causes  unrelated to child abuse  that could explain the occurrence of those conditions. Then, on redirect examination, and over defendant's objections, the prosecutor asked a series of questions concerning whether the child's conditions might just as likely have been caused by child abuse. This line of questioning was acceptable on redirect given that defendant himself opened the door by asking questions regarding possible causation. See State v. Baymon, 336 N.C. 748, 754, 446 S.E.2d 1, 4 (1994) ("The purpose of redirect examination is to clarify any questions raised on cross-examination concerning the subject matter of direct examination and to confront any new matters which arose during cross-examination."). Accordingly, we overrule this assignment of error.

IV
Finally, defendant contends that the trial court erred in providing the following jury instruction on "admissions" modeled on N.C.P.I.Crim. 104.60:
If you find from the evidence presented that the defendant has admitted a fact relating to the crime charged in this case, then you should consider all of the circumstances under which the admission was made in determining whether it was a truthful admission and in determining the weight you will give to it.
"A trial court must give a requested instruction that is a correct statement of the law and is supported by the evidence." State v. Conner, 345 N.C. 319, 328, 480 S.E.2d 626, 629, cert. denied, 522 U.S. 876, 139 L. Ed. 2d 134, 118 S. Ct. 196 (1997). In addition, "[a]n admission is a statement of pertinent facts which, in light of other evidence, is incriminating." State v. Trexler, 316 N.C. 528, 531, 342 S.E.2d 878, 879-80 (1986).
The record in this case reveals the following exchange between the prosecutor and Ms. Michaux: Q. What did [defendant] say when you told him to stop choking [J.T.M.]?
A. He said it was his kid; he could do what he wanted to.
Ms. Michaux then testified that defendant later instructed her not to tell anyone what had happened. These incriminating statements attributed to defendant are sufficient to support an instruction on admissions. See State v. Cummings, 353 N.C. 281, 295, 543 S.E.2d 849, 858 (admissions instruction was proper in trial for first degree murder where defendant had told a detective that "[a] man meant to kill the lady because all you would have had to do was to push her down"), cert. denied, 534 U.S. 965, 151 L. Ed. 2d 286, 122 S. Ct. 375 (2001).
Further, the instruction was appropriate in connection with defendant's theory that J.T.M. likely died from choking on baby formula. On the night of his son's death, defendant told social worker Rhonda Oboh that "he went to stick the bottle in the baby's mouth, and that the child would not take the bottle, and that at that point he knew that something was wrong." Defendant's statement to Ms. Oboh, which tends to show that the child refused the bottle and, therefore, would not have ingested any formula, was relevant to the jury's determination whether the child died innocently from choking on the formula or whether he was strangled. We conclude, in short, that an instruction on admissions was supported in the evidence and was, therefore, appropriately given to the jury.
No error.
Judges TYSON and ELMORE concur.
Report per Rule 30(e).